BART M. DAVIS, ID STATE BAR NO. 2696
UNITED STATES ATTORNEY
**JAMES P. SCHAEFER, CA STATE BAR NO. 250417**
**ASSISTANT UNITED STATES ATTORNEY**
DISTRICT OF IDAHO
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Telephone: 208-334-1211
Facsimile: 208-334-9375
Email: James.Schaefer@usdoj.gov

Attorneys for Plaintiff United States of America

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>SCOTT BURPEE,<br><br>　　　　　Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff United States of America brings this Complaint against Scott Burpee ("Defendant" or "Burpee"), and alleges as follows:

**INTRODUCTION**

1.　　　The United States brings this action against Defendant to recover treble damages and civil penalties under the False Claims Act ("FCA"), as amended 31 U.S.C. §§ 3729 *et seq.*, and the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1833a.  The United States also brings federal common law claims for fraud and unjust enrichment, seeking damages and restitution, respectively.

**COMPLAINT - 1**

2.      As detailed more fully below, this action arises from the conduct of Defendant in knowingly and intentionally withholding material information from, and making material false or fraudulent statements to, the Eastern Idaho Development Corporation ("EIDC") and the United States Small Business Administration ("SBA") regarding the financial condition of Carefix Management and Consulting, Inc. and Safe Haven Healthcare, LLC (collectively, "Safe Haven") to secure a multi-million dollar loan for Safe Haven under the SBA's 504 Loan Program.

## PARTIES

3.      The United States is the plaintiff and brings this action on behalf of the SBA.

4.      Defendant Scott Burpee resides in Idaho.  At all times relevant to this Complaint, Mr. Burpee was the president and either an owner or the sole owner of Safe Haven.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732.

6.      This Court has supplemental jurisdiction to entertain federal common law and equitable causes of action pursuant to 28 U.S.C. § 1367(a).

7.      This Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), and because he resides in this District.

8.      Venue in the District of Idaho is appropriate pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims described herein occurred in this District.

## BACKGROUND

9.      The SBA's 504 Loan Program, which is authorized by Section 504 of the Small Business Investment Act, as amended, 15 U.S.C. §§ 695-697g, provides small businesses

**COMPLAINT - 2**

with long-term financing ("504 loans") for projects involving the acquisition, lease, and improvement or renovation of major fixed assets.  13 C.F.R. §§120.2(c) & 120.800-120.991.

10.     Under the SBA's 504 Loan Program, a small business borrower, usually with assistance from a private sector lender that will be providing interim and/or permanent financing for the project, applies for a 504 loan through a Certified Development Company ("CDC").  13 C.F.R. § 120.80l(a).

11.     If the SBA approves the borrower's loan application, it issues an authorization conditionally agreeing to guarantee (with the full faith and credit of the United States) a debenture that will be pooled with other debentures and sold to investors to provide funding for the 504 loan.  13 C.F.R. § 120.801(d).  SBA regulations provide that "[t]he applicant . . . must be creditworthy," that "[l]oans must be so sound as to reasonably assure repayment," and that, in making this determination, the SBA will consider (among other things) the strength of the business; past earnings, projected cash flow and future prospects; and the "[a]bility to repay the loan with earnings from the business[.]"  *Id.* § 120.150.

12.     Projects financed through the 504 Loan Program usually require an interim loan from a private sector lender ("Interim Lender") to cover construction, lease, or acquisition costs during the period between the SBA's authorization and the closing of the 504 loan.  The interim loan is often provided by the same private sector lender who will be providing a portion of the permanent financing ("Third Party Lender").  13 C.F.R. § 120.80l(b).

13.     Once the project is complete, and all the requirements and conditions of the SBA authorization are met, the CDC arranges for the 504 loan to close.  As part of the 504 Loan Closing, the CDC must certify to the SBA that there have been no substantial adverse

**COMPLAINT - 3**

changes in the borrower's financial condition and ability to repay the loan since submission of the initial 504 loan application.  In making this certification, the CDC relies, in part, on financial documents and written certifications provided by the borrower.  13 C.F.R. § 120.892.

14.     As part of the 504 Loan Closing, the SBA requires the borrower to certify that there has been no unremedied substantial adverse change in the borrower's financial condition or ability to repay the 504 loan since the date of the borrower's application.  The SBA also separately requires the borrower to execute a loan agreement in which the borrower must certify that:  (a) it is not in default of any obligation, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or any mortgage or collateral instrument securing the same; and (b) there has been no adverse change since the date of the loan application in its financial condition, organization, operation, business prospects, fixed properties, or personnel.

15.     After the 504 Loan Closing, the SBA relies, in part, on the borrower's financial documents and certifications in evaluating whether to give final loan approval for the 504 loan and authorize the sale of the guaranteed debenture.  If the borrower fails to disclose or misrepresents a material fact to the SBA regarding the project or the 504 loan, the SBA may, within its sole discretion, decline to sell the debenture or cancel its guarantee of the debenture prior to sale.  13 C.F.R. § 120.960.

16.     If the SBA gives final loan approval, the CDC issues the debenture to a central servicing agent, which sells the debenture to investors and then disburses the proceeds (less administrative costs) to the Interim Lender to pay off the interim loan.

**COMPLAINT - 4**

17.     After the sale of the debenture, the permanent financing for the project consists of:  (a) a contribution from the small business of at least 10 percent of the project costs; (b) a 504 loan made by the CDC with proceeds from the sale of SBA-guaranteed debenture, covering up to 40 percent of the project costs and certain administrative costs, which is collateralized by a second lien on the project property; and (c) a loan from the Third Party Lender covering the remainder of the project costs (approximately 50 percent), which is collateralized by a first lien on the project property.  13 C.F.R. § 120.801(c), §120.900.

18.     The 504 Loan Program is attractive to the investors because, if the borrower defaults on the 504 loan, the SBA is obligated to repurchase the guaranteed debenture, and does so with federal funds.

## STATEMENT OF FACTS

### Safe Haven Sought a 504 Loan to Build a New Facility

19.     Safe Haven owned, leased, and operated assisted living facilities, psychiatric hospitals, and skilled nursing facilities in Idaho.

20.     In February 2013, the Blaine County commissioners voted to give the county nursing home license to Safe Haven.  The county authorized Safe Haven to operate the county's aging nursing home, Blaine Manor, until Safe Haven completed construction of Bell Mountain Village and Care Center ("Bell Mountain"), and then move the residents of Blaine Manor to Bell Mountain.

21.     On or about September 11, 2013, Safe Haven applied to Citizens Community Bank, a Division of Glacier Bank ("CCB") for financing to complete the construction of Bell Mountain.

**COMPLAINT - 5**

22.     On or about January 2, 2014, CCB provided Burpee with a lending commitment letter agreeing that CCB would provide up to $6,375,000 in interim construction financing to Safe Haven provided certain conditions were satisfied.  One of those conditions was SBA approval of a 504 loan.

23.     On or about January 7, 2014, Burpee, on behalf of Safe Haven, applied through a CDC, the EIDC for a 504 loan to finance the construction of Bell Mountain.

24.     On or about January 22, 2014, the SBA issued an Authorization for Debenture Guarantee (SBA 504 Loan) ("Authorization") that conditionally approved the sale of a debenture to fund a 504 loan to Safe Haven to construct Bell Mountain.

25.     The Authorization provided for the following project financing:

a.     Safe Haven would contribute $1,125,000 (*i.e.*, 15% of the anticipated Bell Mountain construction costs).

b.     CCB would provide Safe Haven permanent financing in the amount of $3,750,000 (*i.e.*, 50% of the anticipated Bell Mountain construction costs).  This financing would be secured with a First Deed of Trust and First Perfected Security Interest.

c.     CCB would provide Safe Haven interim financing in the amount of $2,625,000 (*i.e.*, 35% of the anticipated Bell Mountain construction costs).

d.     Upon completion of construction and certain conditions being satisfied, the SBA would replace CCB's interim financing with a 504 Loan.  The 504 Loan would be secured with a Second Deed of Trust and Second Perfected Security Interest and guaranteed by the SBA.

**COMPLAINT - 6**

26.     The Authorization also provided that if the 504 loan did not close within 48 months the Authorization would be cancelled.

### Construction Delays, Cost Overruns, and Safe Haven's Financial Condition Resulted in Numerous Loan Modifications and Delayed the 504 Loan Closing

27.     On or about January 23, 2014, Burpee, on behalf of Safe Haven, executed and delivered to CCB a promissory note for a straight line of credit ("SLOC") of up to $6,375.000.00 (*i.e.*, the combined amount of CCB's interim and permanent financing) with a maturity of December 15, 2014, *i.e.*, the estimated date that the 504 loan would close.

28.     Burpee personally guaranteed repayment of the SLOC.

29.     Due to construction delays and cost overruns and then to allow time for Safe Haven to meet SBA debt service ability and profitability requirements, CCB and Safe Haven modified the SLOC on numerous occasions.

30.     On or about October 28, 2014, due to construction delays and cost overruns, CCB increased the SLOC to $6,875,000 and extended its maturity date to February 15, 2015.

31.     On or about May 8, 2015, CCB extended the SLOC's maturity date to August 20, 2015. The associated CCB Credit Authorization noted:

> *The extension of maturity out 6 months is needed* in order to complete all of the "punch list" items for final construction and *to obtain the needed three months seasoning and cash flow verification the facility needs to show the ability to service the debt to obtain the SBA 504 guarantee and pay down from debenture sale.* It will also allow us time for both the bank and the SBA to obtain and reviewed [sic] financial information from the company for 2014 and for the facility year to date. (Emphasis added.)

32.     On or about November 20, 2015, CCB increased the SLOC to $7,125,000 and extended the maturity date to May 31, 2016. The associated CCB Credit Authorization noted:

> The extension of maturity is needed in order to obtain the needed three-month seasoning the facility needs to show. *The facility must be able to show the ability to service this debt in order for the SBA to be able to sale [sic] the debenture.* The extension will also allow

**COMPLAINT - 7**

time for both the bank and the SBA to obtain and review financial information from the company for 2014 and for the facility year-to-date. . . . *It is anticipated that they will show the ability to service their own debts within the next three months or so. This is very important to the bank whereas the SBA debenture cannot be sold until the facility shows its own ability to service both the bank and SBA loans.* (Emphasis added.)

33.     On or about May 27, 2016, CCB extended the SLOC's maturity date to August 20, 2016. The associated CCB Credit Authorization noted:

The extension of maturity is needed in order obtain the needed three month seasoning the facility needs to show. *The facility must be able to service its own debt in order for the SBA to be able to sale [sic] the debenture. The extension will also allow time for both the bank and the SBA to review financials [sic] information recently provided by the company for 2014 and 2015.* We are currently also waiting for year to date financial information . . . . *This extension will also allow time for the bank and SBA to go over requested updated year to date facility financials to ensure the facilities' ability to show the ability [sic] service its debts.* (Emphasis added.)

34.     On or about August 26, 2016, CCB extended the SLOC's maturity date to February 20, 2017. The associated CCB Credit Authorization noted:

*The extension of the maturity is needed in order to obtain the required financial history of the Bell Mountain Village in Bellevue Idaho; it must show the ability to service this debt so the SBA is able to sell the debenture.* The extension allows time for the bank and SBA to review financial information as well as allow time for the facility to meet the threshold of profitability for the debenture to be sold. *At the end of the six month extension the loan will term out on a 20 year amortization even if the debenture is not sold.* (Emphasis added.)

35.     The August 26, 2016 Credit Authorization also discussed Safe Haven's ongoing efforts to downsize by selling or turning over the leases on 10 of the 18 facilities that Safe Haven owned or operated.

36.     Safe Haven's downsizing effort was triggered by one of its facilities, *i.e.*, Safe Haven Care Center and Hospital in Pocatello, losing its Centers for Medicare & Medicaid Services ("CMS") certification due to patient abuse and neglect issues.

37.     Safe Haven Care Center and Hospital's loss of its CMS certification prevented it from billing both Medicare and Medicaid, which resulted in Safe Haven losing over $2 million

**COMPLAINT - 8**

between May 2015 and November 2016.  This loss eliminated Safe Haven's cash reserves, caused Safe Haven to borrow money from hard money lenders at disadvantageous terms, and contributed to:  (a) Safe Haven accruing millions of dollars in unpaid rent, late fees, and penalties between May 2015 and May 2018; and (b) Safe Haven falling over $1 million behind on its federal taxes in 2016 and 2017.

38.     On or about April 6, 2017, CCB modified the SLOC by splitting it into two loans:

a.      A 20-year loan for $4,201,189 ("Permanent Loan").  This loan was intended to comply with the SBA Authorization for Debenture Guarantee's requirement that CCB provide permanent financing for 50% of Bell Mountain's construction costs. The promissory note on this loan required Safe Haven to make monthly payments to CCB on the first of each month in the amount of $29,403.47.

b.      A new SLOC for $2,933,823 with a maturity of April 20, 2018 ("Interim Loan").  This Interim Loan was intended to comply with the SBA Authorization for Debenture Guarantee's requirement that CCB provide interim financing for 35% of Bell Mountain's construction.  The Interim Loan required monthly interest only payments of approximately $18,000 on the first of each month.

39.     The promissory notes for both the Permanent Loan and the Interim Loan contained the following provision:

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform the term, obligation, covenant

**COMPLAINT - 9**

or condition contained in any other agreement between the Lender and Borrower.

. . .

**Adverse Change.**   A material adverse change occurs in the Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

40.     The CCB Credit Authorization associated with the SLOC being split into two loans stated: "Safe Haven experienced a cash shortage the past couple of months which resulted in the Interim Loan payments being past due." As part of this loan modification, CCB waived late fees totaling $732,375.55.

### Safe Haven's Continued Inability to Service Its Debts

41.     On May 1, 2017, a CCB loan officer, Michael Schwartz, sent Al Burpee, Scott Burpee's son and Safe Haven's CFO at the time, an email stating: "Just checking on your status today. Any chance of a check today?" Al Burpee responded: "I am working on getting some additional financing in to help cover us this month so I can get an additional payment out to you. We are also waiting on getting additional money from the State that we sent to you last week. All of my regular deposit [sic] right now are being tied up in funding our payroll coming up. I will let you know if I get something that pushes me over the top on payroll and allows me to make a payment to you."

42.     On May 2, 2017, Schwartz sent Al and Scott Burpee an email stating: "I appreciate you keeping me in mind. As you both know, I am needing to get some money over here to get the loan caught up. I hope you understand that I will need to continue to try and keep us on your minds. Please keep me posted on the State funds and other funds as they come available."

43.     Throughout 2017, CCB continued to pressure Safe Haven to make loan payments to demonstrate the debt service ability necessary to close the 504 Loan. For example, on

**COMPLAINT - 10**

September 6, 2017, Schwartz sent Al and Scott Burpee an email stating: "Thanks for the June numbers.  I appreciate you getting those over to me.  This month is quarter end, and I can't express to you enough the importance of keeping the loan current going into month end.  Please make sure to make these payments a priority."

44.     On November 7, 2017, CCB sent the EIDC's Executive Director, Samantha Damron, loan payment histories on both the Permanent Loan and the Interim Loan.  It did so in an attempt to persuade Damron that Safe Haven was servicing its debts such that the 504 loan could close.  The Permanent Loan history reflected a current amount due of $29,403.47 and a past due amount of $0.  The Interim Loan history reflected a current amount due of $17,442.18 and a past due amount of $0.

45.     Safe Haven was not, however, able to keep either loan current.

46.     On November 17 and 18, 2017, Safe Haven Care Center and Hospital and a co-located nursing home (collectively, "SHCCH") were destroyed in a fire.

47.     SHCCH generated over 60 percent of Safe Haven's total revenue.  The loss of this revenue contributed to:

a.      Safe Haven missing payments on the Permanent Loan in November 2017, and February, April, June, July, and August 2018.

b.      Safe Haven missing payments on the Interim Loan in both November 2017, and February and April 2018.

48.     In January 2018, with the 48-month deadline to close the 504 loan approaching, Damron requested that the SBA extend the deadline.  The SBA granted the request, extending the closing deadline to June 22, 2018.

**COMPLAINT - 11**

49.    On April 3, 2018, Schwartz emailed Burpee regarding the Interim Loan, stating: "The loan we have on Bell Mountain for he [sic] SBA portion has matured again, I have attached a change in terms agreement I need you to sign and mail back to me.  Could you please do so at your earliest convenience?  I will also need [sic] collect the current interest due on this of $33,377.26 when possible."

50.    On April 10, 2018, Schwartz emailed Scott and Al Burpee, stating: "Just looking for an update on your loan payments.  They are currently sitting at 39 days past due?"

51.    By May 1, 2018, Safe Haven was $58,806.94 past due on the Permanent Loan and had a current amount due of $29,403.47 for a total amount due of $88,210.41.

52.    By May 1, 2018, Safe Haven was $3,134,901.40 past due on the Interim Loan because it had matured and not been paid off.  The past due amount was the sum of $2,933,823 in principal, accrued interest of $52,668.15, and late charges of $148,410.25.

53.    Burpee subsequently executed an undated copy of a change in terms agreement that extended the Interim Loan's maturity date to July 1, 2018.  As a result, as of May 11, 2018, Safe Haven was $207,106.80 past due on the Interim Loan, this amount was comprised of $58,696.55 in accrued interest and $148,410.25 in late charges.

54.    On May 16, 2018, Schwartz sent Scott and Al Burpee an email that stated: "Could you please give me an update [sic] your payments.  Scott you indicated you might have one the first of the week?"

### Burpee Made False and Fraudulent Statements and/or Withheld Material Information to Get the 504 Loan to Close

55.    Closing on the 504 loan on Bell Mountain, took place on May 24, 2018.

COMPLAINT - 12

56.    In connection with the 504 Loan Closing, Burpee, on behalf of Safe Haven, signed: (a) a U.S. Small Business Administration Borrower and Operating Company Certification; and (b) a Loan Agreement.   True and correct copies of these documents are attached as **Exhibit A** and **Exhibit B**.  Both documents contained false or fraudulent statements and/or material omissions regarding the financial condition of Safe Haven, as detailed more fully below.

57.    On May 24, 2018, as part of the 504 Loan Closing, Burpee signed a U.S. Small Business Administration Borrower and Operating Company Certification.  Therein, Burpee certified that:

> Since the date of their application for this Loan, there has been no unremedied substantial adverse change in the financial condition of [Safe Haven or its] ability to pay the Project financing, including this Note.  [Safe Haven has] supplied CDC the following type of accurate financial statements, current within 120 days of 504 Loan closing . . . financial statements.
>
> …
>
> [Safe Haven] warrants and represents that all information provided [EIDC], including without limitation, all information regarding [Safe Haven's] financial condition, is accurate to the best of its knowledge and that [Safe Haven] has not withheld any material information.  [Safe Haven] acknowledges that for purposes of this transaction, [EIDC] is acting on behalf of SBA, an agency of the United States Government . . . [Safe Haven] further acknowledges that any false statement to [EIDC] can be considered a false statement to the federal government under 18 U.S.C. § 1001, and may subject [Safe Haven] to criminal penalties and that [EIDC] and SBA are relying upon the information submitted by [EIDC].

58.    Burpee's certifications that there was no unremedied substantial adverse change in the financial condition of Safe Haven or its ability to make loan payments between the date of the loan application and the submission of the Borrower and Operating Company Certification was knowingly and intentionally false:

**COMPLAINT - 13**

a.      Burpee knew that there were unremedied substantial changes in Safe Haven's financial condition, including that Safe Haven had not recovered from either:  (i) the over $2 million loss that Safe Haven incurred as a result of Safe Haven Care Center and Hospital losing its CMS certification; or (ii) the fire that destroyed SHCCH in November 2017.

b.      As to the fire that destroyed SHCCH in November 2017, Burpee knew that Safe Haven had not and would not receive insurance proceeds sufficient to remedy the loss of over 60% percent of Safe Haven's total revenue.  Burpee knew that Safe Haven had only received approximately $139,000 in insurance proceeds before it assigned its right to further insurance proceeds to the landlord of its Pocatello and Wendell facilities.

c.      Burpee assigned Safe Haven's right to further insurance proceeds to Safe Haven's landlord in exchange for the contingent forgiveness of over $7,000,000 in back rent, late fees, and penalties that Safe Haven owed on its facilities in Wendell and Pocatello.  The back rent, late fees, and penalties on the Wendell facility were subsequently forgiven in April 2019.  The back rent, late fees, and penalties on the Pocatello facilities were subsequently forgiven in July 2020.

d.      Burpee also knew that, due to the mountain of debt Safe Haven incurred as a result of both Safe Haven Care Center and Hospital losing its CMS certification and SHCCH being destroyed by a fire in November, Safe Haven did not have the ability to make payments on either the Permanent Loan or the 504 loan absent a multimillion dollar recapitalization.

**COMPLAINT - 14**

59.    Burpee's certifications that Safe Haven had not withheld any material information was also knowingly and intentionally false.  Burpee knew that Safe Haven had not disclosed to the EIDC or the SBA that:

a.    Safe Haven had not been paying its rent since 2015, and, therefore, owed over $7,000,000 in back rent, late fees, and penalties.

b.    Safe Haven had assigned its right to further insurance proceeds to its landlord, despite Safe Haven having previously informed the EIDC that Safe Haven would be receiving insurance proceeds sufficient to remedy the loss in revenue caused by the fire that destroyed SHCCH.

c.    Safe Haven's ability to make payments on the 504 loan was contingent upon a multimillion-dollar recapitalization through the sale of Burpee's stock in Safe Haven to investors.  When deposed pursuant to a Civil Investigative Demand, Burpee testified that:

> Q. At the point when you signed the loan documents on May 24, 2018, you knew that Safe Haven was going to have to make payments on that loan.
> A. Correct.
>
> Q. Looking at Safe Haven's financials, it doesn't appear that it had the ability to make those payments, absent some form of recapitalization or some loan from another source; is that fair?
> A. Yes.
>
> Q. So you knew in May that you needed a recapitalization in order to pay the SBA on the 504 loan?
> A. I knew something had to change; that's correct.  And we were relying on an infusion of cash from Mr. Lloyd's investment group to do that. And he was really adamant that he wanted the SBA loan to close because he didn't want to make the higher payments for the construction loan, plus there was some debate as to whether that loan was assumable. The SBA loan was.

. . .

> Q. …When you signed on May 24, 2018, you were planning to sell the company in order to save the company.
> A. Sell my stock in the company.
>
> Q. You needed a multimillion dollar recapitalization; correct?
> A. Correct.

. . .

> Q. Let me be candid, Mr. Burpee. I have a company that in 2014 is healthy, applies for a 504 loan, that loan is approved. That loan doesn't close for 4 years because of construction issues, and then profitability issues and financial health issues. It finally manages to close in May 2018. Safe Haven never makes a payment on that loan and files for bankruptcy instead. Am I understanding you correctly that you believe the Eastern Idaho Development Company should have anticipated the bankruptcy?
> A. No, I didn't say that.
>
> Q. So upon the closing in May of 2018, what information did the Eastern Idaho Development Corporation have that would let them know this is basically a house of cards, unless there's a recapitalization this loan is never getting repaid?
> A. I was assuming they were getting that information from Citizens Community Bank.
>
> Q. But you never told them that.
> A. No. And I didn't have occasion to be asked that other than that form that you pointed out there[, *i.e.*, the Borrower and Operating Company Certification.]

60.     Burpee's certification that Safe Haven had provided the EIDC with "accurate financial statements" was also knowingly and intentionally false:

     a.     Burpee knew that Safe Haven's financial statements did not include the full amount of the back rent that Safe Haven owed to the landlord of its Pocatello and Wendell facilities.

**COMPLAINT - 16**

b.     Burpee knew that Safe Haven had buried some of the back rent it owed on its Pocatello facility by mischaracterizing back rent as Accounts Payable Trade in Safe Haven's financial statements.

c.     Burpee knew that Safe Haven's financial statements did not include the late fees and penalties that Safe Haven owed to the landlord of its Pocatello and Wendell facilities.

d.     Burpee knew that Safe Haven's financial statements did not include the full amounts owed to vendors, such as the vendor that leased equipment to Bell Mountain.

e.     Burpee knew that Safe Haven's financial statements included as revenue insurance proceeds that Safe Haven had not received.

61.     On May 24, 2018, Burpee signed a Loan Agreement for the 504 loan on Bell Mountain.  Therein, Burpee certified:

> [Safe Haven] is not in default of any obligation, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or any mortgage or collateral instrument securing the same.
>
> …
>
> [Safe Haven] certifies that there has been no adverse change since the date of the loan application in [Safe Haven's] financial condition, organization, operation, business prospects, fixed properties, or personnel.

62.     Burpee's certification in the Loan Agreement that Safe Haven was not in default of any obligation or condition contained in any note or other evidence of indebtedness was knowingly and intentionally false:

a.     Burpee knew that Safe Haven was not current on the Permanent Loan and, therefore, in default on the Permanent Loan.

**COMPLAINT - 17**

b.    Burpee knew that Safe Haven was not current on the Interim Loan and, therefore, in default on the Interim Loan.

c.    Burpee knew that Safe Haven was not current on one or more of the loans that it had taken from hard money lenders and, therefore, was in default on one or more of those loans.

d.    Burpee knew that there were material adverse changes in Safe Haven's financial condition and, therefore, was in default on both the Permanent Loan and the Interim Loan.

63.    Burpee's certification in the Loan Agreement that there had been no adverse change in Safe Haven's financial condition, organization, operation, business prospects, fixed properties, and personnel since the date of the loan application was also knowingly false for the reasons described above.

64.    Burpee's knowingly false statements were made for the purpose of:  (a) obtaining an SBA loan for Safe Haven; (b) influencing the actions of the SBA; and (c) obtaining money or anything of value.

**Burpee Made False and Fraudulent Statements and Withheld Material Information After the 504 Loan Closing but Before the Funding of the 504 Loan through the Debenture Sale**

65.    Approximately 48 days elapsed from the date of the 504 Loan Closing on May 24, 2018 and the funding of the 504 loan through the sale of the guaranteed debenture on July 11, 2018.

66.    During this period, Burpee knowingly and intentionally withheld material information regarding Safe Haven's financial condition to obtain final approval of the 504 loan and the sale of the debenture.

**COMPLAINT - 18**

67.     For example, in June 2018, Burpee prepared, but did not provide the EIDC or

SBA, a "Restructuring Narrative" that stated:

> Safe Haven has gone through a very tough 3 year period, in April 2015 the Hospital in Pocatello lost it's [sic] Medicare/Medicaid certification resulting in one of the partners having to exit the company and a 20 month period that required the hospital to stay open and operating without any revenue, a loss of over $2 million. Safe Haven was confident that once we earned back the certification we would be able to slowly pay off the mountain of debt accumulated during that period. Due to the circumstances involved with the certification and neglect associated with that (which current ownership was not involved in) numerous lawsuits in the aftermath also added to a lot of unnecessary expenses. Last fall things started looking up as we were making a profit, we had shed some unprofitable facilities and we had prevailed on several claims and litigation's [sic] against Health and Welfare. Cash flow had started rebounding and operations were stabilizing. However due to some timing issues, new regulations and staffing shortages the nursing home in Pocatello surrendered it's [sic] Medicare/Medicaid certification and was in the process of converting that facility to a living center for the mentally ill when the fire destroyed the facility on November 17th, 2017. *With the loss of over 60% of our revenue we have been unable to generate enough cash flow to retire old debts accumulated during the hospital re certification years and fund remaining operations, insurance proceeds have not covered any of this and in fact most will go to the land lord. While Safe Haven brought down it's [sic] tax liens from $1.2 million to just over $130,000.00 and has paid down many vendors we have reached a critical mass and must either find a way to recapitalize the company or file for protection from creditors*, this while remaining operations are functioning well and operating cost have been greatly slashed. In fact PR is about a third of a year ago. An investor group is pursuing buying out the majority of stock in the company and as part of this the current owner will put in $750,000.00 (of proceeds) of cash to cover old debts and allow the company to emerge healthy without the debt burden incurred in the past. Scott Burpee, the current owner will remain on as a consultant and operate the Wendell facility. *In exchange for insurance proceeds and releases to the landlord of the Pocatello facility they have executed an agreement to forbear future rent payments and forgive approximately $7.2 million in back rents and late fees for Pocatello and Wendell.* This combined with the cash infusion will leave Safe Haven with a very positive balance sheet and the ability to move forward with expansion plans for another replacement hospital in Twin Falls.
>
> Due to the fact that accounting software was in the process of being converted to a different company at the time of the fire, financials were delayed as corp. office staff was downsized and year end wrap up with the previous software was necessary before 2018 could be implemented. This has now been done and the recapitalization is proceeding with the buyers examining the amount of remaining debt that they will inherit and be covered as part of the stock sale. We hope to have all this wrapped up in the next few weeks and close the sale by July 31st. *During this time only utilities and physician bill will be paid as cash is very short.* (Emphasis added.)

**COMPLAINT - 19**

68.     Neither the EIDC nor the SBA would have given final approval for the 504 Loan had Burpee disclosed that Safe Haven had "reached critical mass and must either find a way to recapitalize the company or file for protection from creditors."

69.     During the 48 days that elapsed between May 24, 2018 and the funding of the 504 loan on July 11, 2018, Burpee also made additional false and fraudulent statements to obtain final approval of the 504 loan and the sale of the debenture.

70.     In June 2018, the SBA requested through the EIDC that Safe Haven provide updated financial statements.

71.     On or about June 29, 2018, Burpee signed and sent Damron a document titled "Statement of Operation - Month Wise" that indicated it encompassed all of Safe Haven's remaining facilities and covered the period of January 1, 2018 to March 31, 2018.

72.     The "Statement of Operation - Month Wise" indicated that Safe Haven had a Net Income for the first quarter of 2018 of $56,597; it reflected a net loss of $32,335 in January 2018; a net income of $50,508 in February 2018, and a net income of $38,424 in March 2018.

73.     The "Statement of Operation - Month Wise" was false and fraudulent because it overstated Safe Haven's revenue to create the false impression that Safe Haven had a net income of approximately $56,597 in the first quarter of 2018, as opposed to the net loss it actually suffered:

      a.     The "Statement of Operation - Month Wise" indicated that in the first quarter of 2018 Safe Haven had non-operating income of $424,858 in "Insurance Proceeds"; $141,619 in "Insurance Proceeds" in each of January, February, and March.

      b.     Safe Haven had not, however, received $424,858 in "Insurance Proceeds."

      c.     Safe Haven only received approximately $139,000 in insurance proceeds.

**COMPLAINT - 20**

      d.      Accordingly, the Statement of Operation - Month Wise overstated Safe Haven's income by at least $282,000.

74.      The EIDC and/or the SBA would have cancelled the sale of the debenture if they had been provided accurate financials showing that Safe Haven had a net loss of at least $225,000 in the first quarter of 2018.

75.      Burpee also failed to disclose to the EIDC or the SBA that Safe Haven failed to make required payments in June and July on both the Permanent Loan and Interim Loan.

76.      The inability of Safe Haven to make these payments reflected a further substantial adverse change in Safe Haven's financial condition that could reasonably be expected to affect the EIDC's and the SBA's evaluation of the 504 loan.

77.      Although he had time to do so before the SBA approved the 504 loan and/or sold the debenture, Burpee failed to disclose this additional information to the EIDC or the SBA.

78.      The EIDC and the SBA would not have given final approval for the 504 loan and/or would have cancelled the sale of the debenture if they had known that Safe Haven failed to make required payments in June and July on both the Permanent Loan and Interim Loan.

**Safe Haven Files for Bankruptcy Without Making a Single Payment on the 504 Loan, Forcing the SBA to Repurchase the Debenture**

79.      On or about July 11, 2018, the 504 loan was funded through the sale of a $3,020,000 guaranteed debenture and the proceeds (minus administrative costs) were disbursed to CCB to pay off the Interim Loan.

80.      Safe Haven's first payment on the 504 loan was due on August 1, 2018.

81.      Safe Haven did not make the first payment or any other payment on the 504 Loan.

82.      Instead, on August 10, 2018, Safe Haven filed for bankruptcy.

**COMPLAINT - 21**

83.     Under the Loan Agreement, Safe Haven defaulted on the 504 loan by filing for bankruptcy.

84.     Safe Haven defaulting on the 504 loan caused the EIDC to request that the SBA repurchase the guaranteed debenture.

85.     On or about September 3, 2018, the SBA made good on its guarantee and repurchased the debenture with $3,020,000 in federal funds.

**The SBA Relied on Burpee's False or Fraudulent Statements and Omissions**

86.     Burpee acknowledged in the Borrower and Operating Company Certification that the EIDC was "acting on behalf of SBA," "any false statement to [EIDC] can be considered a false statement to the federal government," and the "[EIDC] and SBA are relying upon the information submitted by [EIDC]."

**Burpee's False or Fraudulent Statements and Omissions were Material**

87.     Burpee's false and fraudulent statements and omissions masked the fact that specific conditions required for the 504 loan approval and debenture sale had not been met, causing the SBA to approve the loan, guarantee the debenture, and pay loan proceeds to CCB when it otherwise would not have done so.

88.     The false or fraudulent statements, certifications, and omissions that Burpee made influenced the SBA's decision to give final loan approval and guarantee the debenture funding the 504 loan because they related directly to essential requirements or conditions that had to be satisfied prior to loan approval, the financial condition and creditworthiness of Safe Haven, and the risk to be undertaken by the SBA in guaranteeing the debenture.

89.     If the SBA had known that Safe Haven was not current on its payments to CCB, had been and was unable to pay rent when due, had assigned away insurance

**COMPLAINT - 22**

proceeds, required recapitalization to avoid bankruptcy, and/or was not profitable, or been informed of other adverse financial conditions that Burpee either withheld, falsified, or misrepresented, as set forth in the preceding paragraphs, the SBA would not have approved the 504 loan, guaranteed the debenture funding the 504 loan, expended the associated administrative costs, or been required to repurchase the debenture pursuant to its guarantee when Safe Haven defaulted on the 504 loan.

90.     In fact, had Burpee made complete and truthful disclosures, the most basic conditions for loan approval would not have been met, and the SBA would have had no discretion to approve the loan or authorize the sale of the debenture.

### Burpee's False or Fraudulent Statements and Omissions Led Directly to the Submission of a False Claim Resulting in Damages to the United States

91.     By withholding information and providing false or fraudulent information to the EIDC and the SBA, as set forth in the preceding paragraphs, Burpee induced the SBA to approve the 504 loan and issue the guaranteed debenture, make payment to CCB of the Net Debenture Proceeds, and participate in the permanent financing for the Bell Mountain project as a subordinate lender.

92.     Burpee's false and fraudulent statements and omissions, while remaining inchoate until Safe Haven's later default, had a direct nexus with the ultimate presentation of the false claim in this instance, because they involved facts and conditions that were essential to meeting loan approval requirements and related directly to whether the borrower would be able to meet loan payments.

93.     Burpee's false or fraudulent statements and omissions were the essential conditions that induced the United States to guarantee the debenture funding the 504 loan,

**COMPLAINT - 23**

which led directly to an enforceable demand for money upon the United States, *i.e.*, the EIDC's request that the SBA repurchase the debenture.

94.     When Safe Haven defaulted on the 504 loan by filing for bankruptcy, it triggered the debenture guarantee and caused a financial loss to the SBA in repurchasing the debenture in the amount of $3,020,000, plus administrative costs and interest.

## FIRST CAUSE OF ACTION
### (False Claims Act: Presentation of False Claims)

95.     The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

96.     Burpee knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval to an officer, employee or agent of the United States, in violation of 31 U.S.C. § 3729(a)(l)(A).

97.     By virtue of the false or fraudulent claim that Burpee made or caused to be made, the United States suffered damages and is entitled to recover treble damages and civil penalties for each violation under the False Claims Act.

## SECOND CAUSE OF ACTION
### (False Claims Act: Making or Using False Record of Statement)

98.     The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

99.     Burpee knowingly made, used, or caused to be made or used false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729 (a)(l)(B).

100.     By virtue of the false records or statements made and/or used by Burpee, the United States suffered damages and is entitled to recover treble damages and civil penalties for each violation under the False Claims Act.

COMPLAINT - 24

## THIRD CAUSE OF ACTION
### (FIRREA: Making False Statements to the SBA)

101.    The United States repeats and re-alleges each allegation in the preceding

paragraphs as if fully set forth herein.

102.    Burpee knowingly made false statements to the SBA for the purpose of obtaining

a loan, influencing the action of the SBA, and/or obtaining something of value in violation of 15

U.S.C. § 645(a).

103.    The false statements made by Burpee resulted in a pecuniary loss to the SBA of at

least $3,020,000.00.  Under 12 U.S.C. § 1833a(b), Burpee is liable for a civil penalty not to

exceed either $1.1 million or the amount of the pecuniary loss to the SBA, whichever is greater.

## FOURTH CAUSE OF ACTION
### (Fraud)

104.    The United States repeats and re-alleges each allegation in the preceding

paragraphs as if fully set forth herein.

105.    Burpee engaged in conduct designed to deceive both the EIDC and the SBA as to

the financial condition of Safe Haven.  Burpee did so to aid the sale of his stock in Safe Haven

and personally obtain over $2 million.

106.    Burpee knowingly and intentionally made false and fraudulent statements to both

the EIDC and the SBA regarding the financial condition of Safe Haven, including that: (a) there

were no unremedied adverse changes in Safe Haven's financial condition; (b) Safe Haven was

not in default on the Permanent Loan or Interim Loan; and/or (c) Safe Haven was profitable.

107.    Burpee knowingly and intentionally withheld material information from both the

EIDC and the SBA regarding the financial condition of Safe Haven, including that Safe Haven:

(a) owed millions of dollars in back rent, late fees, and penalties; (b) had assigned to its landlord

**COMPLAINT - 25**

Safe Haven's right to further insurance proceeds from the fire that destroyed SHCCH in November 2017; and (c) had "reached critical mass and must either find a way to recapitalize the company or file for protection from creditors."

108.    Burpee's false and fraudulent statements and omissions regarding the financial condition of Safe Haven were material to the EIDC's and the SBA's decisions to approve the 504 loan and the SBA's decision to guarantee the debenture.

109.    Burpee intended that both the EIDC and the SBA would approve the 504 loan based on his false and fraudulent statements and omissions regarding the financial condition of Safe Haven.

110.    Burpee intended that the SBA would guarantee the debenture based on his false and fraudulent statements and omissions regarding the financial condition of Safe Haven.

111.    Neither the EIDC nor the SBA were aware when they approved the 504 loan that Burpee's statements regarding the financial condition of Safe Haven were false and fraudulent or that Burpee had withheld material information regarding Safe Haven's financial condition.

112.    The EIDC and the SBA reasonably relied upon Burpee's false and fraudulent statements and omissions regarding Safe Haven's financial condition when they closed on the 504 loan, gave final approval for the 504 loan, and/or authorized the sale of the guaranteed debenture.

113.    The EIDC and the SBA were entitled to rely upon Burpee's false and fraudulent statements regarding Safe Haven's financial condition.

114.    The EIDC and the SBA were entitled to rely upon Burpee to disclose all material information regarding Safe Haven's financial condition; Burpee had a duty to disclose all such information.

**COMPLAINT - 26**

115.    As a result of Burpee's false and fraudulent statements and material omissions, the United States was damaged and is entitled to recover damages and punitive damages.

### FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

116.    The United States repeats and re-alleges each allegation in the preceding paragraphs as if fully set forth herein.

117.    Because of the acts and omissions of Burpee, the SBA approved the 504 loan on Bell Mountain and guaranteed a debenture to fund that 504 loan, which allowed Burpee, as the sole owner of Safe Haven, to secure a pecuniary benefit (*i.e.*, loan proceeds) that Safe Haven was not entitled to receive.

118.    Burpee has therefore been unjustly enriched and the United States has been damaged.

119.    The United States is entitled to restitution in an amount to be determined at trial.

### PRAYER FOR RELIEF

1.    On the First and Second Causes of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as required by law, and such other and further relief as the Court deems just and proper.

2.    On the Third Cause of Action under FIRREA, for a civil penalty up to the maximum amount allowed under FIRREA, the amount of the SBA's pecuniary loss, and such other and further relief as the Court deems just and proper.

3.    On the Fourth Cause of Action for common law fraud, for the amount of the United States' damages, punitive damages, and such other and further relief as the Court deems just and proper.

**COMPLAINT - 27**

4.      On the Fifth Cause of Action for unjust enrichment, for restitution in the amount

by which Burpee was unjustly enriched, plus interest, costs, and expenses, and such other and

further relief as the Court deems just and proper.

5.      United States further prays for reasonable attorney's fees.

The United States hereby demands trial by a jury as to all issues so triable.

Respectfully submitted this 7th day of January 2021.


                                        BART M. DAVIS
                                        UNITED STATES ATTORNEY
                                        By:


                                        _/s/ James P. Schaefer_
                                        JAMES P. SCHAEFER
                                        Assistant United States Attorney


**COMPLAINT - 28**